KATIE WILDEBOER, Appellee, v. HENRY PETERSON, Appellant.

**WITNESSES: Credibility—Jury Question on Discredited Testimony.**
1 The testimony of a prosecuting witness (forcible defilement in instant case) may be very seriously discredited, yet present a jury question as to its credibility.

**WITNESSES: Examination—Leading Questions Condemned.** Record
2 reviewed, and held that, in the examination of certain witnesses, leading questions were not permissible.

**EVIDENCE: Relevancy, Materiality, and Competency—Conduct of**
3 **Third Party As Bearing on Motive.** The long delayed institution of a prosecution for forcible defilement, and then its institution by a member of the family of the alleged injured female, coupled with the very serious discrediting of the testimony of the latter, may render the animus and state of mind of such member of the family justifiably material, and require the reception in evidence of threats, in the presence of the alleged injured woman, by said member ''to get even'' with the accused for *other* claimed wrongs.

**EVIDENCE: Relevancy, Materiality, and Competency—Matters of**
4 **Speculation.** Transactions which account for a fact by a process of so-called reasoning which is purely speculative, are wholly inadmissible.

**EVIDENCE: Relevancy, Materiality, and Competency—Conversations**
5 **in the Presence of Prosecutrix.** In a civil prosecution for forcible defilement, statements may become material when made in the presence of the injured female, and long after the commission of the alleged offense, and by a member of her family who was instrumental in later initiating the prosecution, to the effect that the accused was a good man, and that a person other than the accused was responsible for the woman's condition.

**EVIDENCE: Opinion Evidence—Absence of Showing of Cause and Ef-**
6 **fect.** Evidence in an action for forcible defilement, to the effect that the injured female suffered a case of nervous prostration over two years after the alleged assault, is wholly inadmissible, in the absence of any testimony tending to show that such condition was attributable to the alleged assault.

Headnote 1:  38 Cyc. p. 1520.  Headnote 2:  40 Cyc. pp. 2422, 2423. Headnote 3:  33 Cyc. p. 1522.  Headnote 4:  22 C. J. p. 163.  Headnote 5:  22 C. J. p. 321.  Headnote 6:  22 C. J. p. 644.

*Appeal from Tama District Court.*—B. F. CUMMINGS, Judge.

APRIL 7, 1925.

REHEARING DENIED MAY 11, 1926.

CIVIL action to recover damages for the forcible defilement of plaintiff. Verdict and judgment in her favor, and the defendant appeals.—*Reversed.*

*George Cosson, E. N. Farber,* and *H. J. Ferguson,* for appellant.

No appearance for appellee.

STEVENS, J.—I.  This is an action to recover damages for the forcible defilement of Katie Wildeboer, appellee, who, at the time of the alleged assault, on the evening of September 27, 1912, was unmarried, and about 28 years of age.

1. WITNESSES: credibility: jury question on discredited testimony.

Appellant was about 41. The assault is alleged to have been committed in a shed near the residence in which she lived with her parents, on a farm owned by appellant. Three trials in the court below have resulted in substantial verdicts in her favor. The two prior verdicts were set aside by this court, and new trials awarded. See *Wildeboer v. Peterson,* 182 Iowa 1185, and *Wildeboer v. Peterson,* 187 Iowa 1169.

Much stress is laid by counsel for appellant upon the proposition that the verdict is not supported by the credible testimony introduced upon the trial. It is not argued that the direct testimony upon the last trial did not make out a prima-facie case for appellee, but it is contended that appellee is so thoroughly discredited and impeached as that her testimony should have been disregarded by the jury. There are many particulars in which it appears that appellee changed and added materially to her testimony upon the two previous trials. She was a witness before the grand jury of Butler County in 1913, when an effort was made to secure an indictment against appel-

lant for the crime of rape. No indictment was returned by the grand jury, the members of which were witnesses in behalf of appellant. It appears from the testimony of these witnesses that appellee did not then testify that appellant threatened to choke or to kill her if she did not keep still; that she made an outcry; or that she resisted the assault by fighting appellant. It also appears that she did not so testify upon the former trials of this case. Her testimony is in conflict as to the exact hour and date when the assault was committed, and as to the condition of her clothing. Appellant denied the charges *in toto;* and her testimony is corroborated only by that of her mother, to whom she claims to have made immediate complaint, and to whom she exposed her person, which, the mother testified, showed evidence of recent sexual intercourse and of violence. The only evidence of violence, aside from the testimony of appellee, was that of her mother, that there were marks or red places on her limbs just above the knee.

Evidence was introduced of subsequent and continued friendly relations between appellee, appellant, and the members of her family. No action was taken against appellant until on or about the 17th day of June, 1913, when Philip Wildeboer, her stepfather, filed an information before the justice of the peace, charging appellant with the crime of seduction. This information was dismissed; and on June 26th, another information, subscribed and sworn to by Philip, charging him with rape, was filed.

Appellee gave birth to a child, which died a few minutes after it was born, on June 30, 1913. Although she was never married, she had a son of school age at the time it was alleged the assault occurred. Testimony was also introduced to the effect that Philip Wildeboer, on different occasions after the assault was committed, spoke kindly of appellant in the presence of appellee. It is also shown that there was a quarrel between them in May, 1913, over some oats; and this is blamed for the charges against appellant. The contradictions in appellee's testimony were all brought out before the jury, which evidently, nevertheless, believed the substance of her story. There was testimony from which the jury could find, if appellee was believed, not only that sexual intercourse was had between

them, but that it was accomplished without appellee's consent. Her testimony is, of course, seriously discredited by her failure to testify fully on the previous trials to what occurred, if she told the truth upon the last trial; but the credibility of her testimony was for the jury, and it is not so wholly unworthy of belief as to justify this court in holding, as a matter of law, that she should not be believed. Appellee is illiterate and ignorant. She was born in Germany, and speaks English with some difficulty; while her mother is unable to speak or understand the English language, and testified through an interpreter.

The court did not err in refusing to direct the jury to return a verdict in appellant's favor, as requested at the conclusion of all of the testimony.

II. The court permitted leading questions propounded to appellee and her mother to be answered, over the repeated objections of appellant. Leading questions should not have been permitted in the examination of these witnesses. The court, however, carefully guarded the examination, and it is clear to us that no substantial prejudice resulted from the rulings complained of. Appellee was somewhat reluctant to answer, and, unless interrogated closely, went little into detail. Leading questions should, however, be avoided, in the event of a retrial of the case.

2. WITNESSES: examination: leading questions condemned.

III. Appellant testified that a controversy over some oats occurred on May 29, 1913, between himself and Philip Wildeboer, in the living room of the house in which the family resided. The court refused to permit appellant to testify that Philip, upon that occasion, threatened to get even with him. Philip was not a witness upon the trial, and the credibility of his testimony was not involved. Just when Philip learned of the alleged assault upon appellee is not disclosed; but his wife testified that she did not tell him about it for several months. It is claimed that the controversy above referred to was in the presence of appellee, and that she told her stepfather to be still. While this conversation did not pertain to the subject-matter of this action, it cannot be wholly separated from the admitted fact that no information was filed against appellant until very shortly before appellee was con-

3. EVIDENCE: relevancy, materiality, and competency: conduct of third party as bearing on motive.

fined. The inference to be drawn from this incident, it is true.
is more or less remote; but we think that, as a circumstance
occurring in the presence of appellee, it bore to some extent
upon the motive of Philip in causing the information to be
filed. That is to say, there is a more or less direct relationship
between this incident and the institution of the criminal prose-
cution.

IV. It was developed in the evidence that appellee, at the
time of the alleged assault, had a half sister, Minnie, unmar-
ried, who also resided at home. Minnie gave birth to a child,

4. EVIDENCE: rela- July 7, 1913, about one week after appellee was
vancy, materi- confined. She later married a man by the name
ality, and
competency: of Fritz Hinders. It was claimed by appellant
matters of
speculation. that appellee and her sister Minnie went buggy-
riding on the evening of September 29, 1912, with Fritz, and
that they did not return until a late hour. Fritz resided with
his brother Orin, near the Wildeboer home. They were both
unmarried, and "bached." As we understand the contention
of appellant, it is that the two sisters may have gone to the
home of the Hinders brothers, or otherwise encountered Orin,
and have become pregnant. There was testimony that Philip
Wildeboer, upon one occasion, said to a neighbor that Orin
Hinders was the cause of appellee's condition. The testimony
was wholly speculative, and without the slightest probative
value as to any issue involved in this case.

V. A witness who testified that he had a conversation, at
the home of appellee, with her stepfather, in the presence of
herself and her mother, was asked to detail what was said. The
witness was not permitted to do so. It was

5. EVIDENCE: rele- claimed that this witness would testify that
vancy, materi-
ality, and Philip, on that occasion, said that Orin Hin-
competency:
conversations in ders was the cause of Katie's condition; also,
the presence of
prosecutrix. that, during the conversation which occurred in
the spring of 1913, Philip, referring to appellant, spoke of him
as a good man. The ground, as we understand the record, upon
which the court excluded this testimony was that it was not
clear that the conversation occurred in appellee's presence. The
record is not quite clear on this point, but we think it sufficient
to justify the admission of this testimony in evidence.

VI.   Two physicians who claimed to have treated appellee for neurasthenia in the spring and summer of 1915 and the fall of 1917, respectively, were permitted, over the objections of appellant, to fully describe her condition, and to detail the history of the case, as revealed to them by appellee.

6. EVIDENCE: opinion evidence: absence of showing of cause and effect.

It appears from the testimony of these witnesses that she was troubled with physical weakness, nervousness, loss of sleep, mental apathy, and other symptoms indicating the disease stated.   One of the grounds of objection to the testimony of these medical witnesses was that there was nothing to show that her condition, at the time she was examined and treated by them, was attributable to the assault which she claims was made upon her.   The witnesses agreed that bad news, worry, misfortune, or anything of that kind, are efficient causes of neurasthenia.   One of the physicians testified that she told him that her difficulty began in 1915, following a severe shock which she received upon a previous trial of this case.   He also testified that he could form no idea as to when her condition arose, but that he based his conclusion upon the statements made by her.   The other witness testified that it might have been of several years' standing.   The only testimony of other witnesses who knew her after the assault, as to her physical and mental condition, was that of her mother, who testified that she was, to some extent, unable to sleep, and that, prior to her confinement, her feet and limbs became swollen.   There was also testimony that she had, for a long time following the alleged assault, complained of pain or soreness in her back.   Appellant, if liable at all, is liable only for such damages, mental and physical, as were the reasonable and probable result of the assault with the commission of which he is charged.   The court instructed the jury quite fully as to the measure of damages and the elements entering therein.   The substance of the instruction was that the amount to be allowed was such sum as would fairly and reasonably compensate appellee for the damages sustained; and that, in estimating such damages, the jury should take into consideration the expense made necessary on account thereof, the physical pain and suffering endured, the injury to her person, health, and reputation, and also mental

anguish and humiliation suffered by her. As bearing upon this question and the law of indecent assaults, attention is called to *Wright v. Starr,* 42 Nev. 441 (6 A. L. R. 981, and note); *Bye v. Isaacson,* 42 N. D. 417 (6 A. L. R. 1067, and note). Surely, it cannot be that appellee's physical and mental condition, caused by a shock, however severe, more than two years after the wrong was committed, received by her while in attendance upon the trial of her case, is a proper element of damages, unless the shock is in some way attributable to the original injury. There is nothing in the record to indicate what produced the shock during the trial, nor to connect it with the alleged assault. This testimony, going directly to the question of damages, was necessarily prejudicial to appellant, and may have materially enhanced the damages.

It is indeed regrettable that this case must again be reversed; and this is said without any criticism of the trial court. The record shows that the case was carefully tried. We are persuaded, however, that this testimony was inadmissible and highly prejudicial. For the error here pointed out, the judgment of the court below is—*Reversed.*

FAVILLE, C. J., and VERMILION, J., concur.

DE GRAFF, J. (specially concurring). I concur in the foregoing opinion, but would reverse on the merits of the cause, also.

ARTHUR, J., joins in the special concurrence.